**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

| | |
|---|---|
| JOHN GORMLEY and ANDREA GORMLEY in their own right and as parents and natural guardians of P.G., a minor and Florence Shimkus : : : : : : **Civil Action No.** : Plaintiffs : : v. : **Jury Trial Demanded** : SOLVAY : SPECIALTY POLYMERS USA, LLC : : Defendant. : | |

## I.  NATURE OF ACTION

1. This is a civil action for compensatory and punitive damages, including medical monitoring and costs incurred and to be incurred by Plaintiffs arising from the intentional, knowing, reckless and negligent acts and omissions of Defendant Solvay Specialty Polymers, USA, LLC ("Solvay" or "Defendant") resulting in the contamination of drinking water supplies used by the Plaintiffs.  The contamination was caused by Defendant's manufacturing, use, discharge and/or disposal of perfluorinated materials including C-4 through C-16, fluoropolymers and fluorotelomers (hereinafter "PFAS") at and/or otherwise attributable to the plant in West Deptford Township, New Jersey.

## II.  PARTIES, JURISDICTION, AND VENUE

2. Defendant Solvay Specialty Polymers, USA, LLC is a Delaware corporation with its principal place of business at 4500 McGinnis Ferry Road, Alpharetta, Georgia 30005.  Its principal officers are George Corbin (President and CEO) and Maureen Carl (Vice President), both of whom are citizens of Texas who work at 3333 Richmond Avenue, Houston, Texas

77098.  Solvay Specialty Polymers, USA, LLC is a wholly-owned subsidiary of Solvay S.A., a *société anonyme* organized under the laws of Belgium with principal place of business in Brussels, Belgium.

3. Solvay owned and operated a manufacturing site at 10 Leonard Lane in West Deptford Township, Gloucester County, New Jersey (the "Facility").  The site encompasses 243 acres and is known to be contaminated with PFAS.

4. Gormley Plaintiffs are citizens of the State of New Jersey.  Gormley Plaintiffs all reside at 2 Clement Drive, West Deptford, New Jersey.

5. Plaintiffs John Gormley and Andrea Gormley are the parents of Plaintiff P.G.  and the three of them have continuously resided at 2 Clement Drive for thirty-three years, or, in P.G.'s case, since birth.

6. Plaintiff John Gormley and Andrea Gormley own the home at 2 Clement Drive, which has a private well which is used for its domestic water supply.

7. Plaintiff Florence Shimkus is a citizen of the State of New Jersey resident at 4 Clement Drive in West Deptford, which also has a private well used for its domestic water supply.

8. Jurisdiction is based on diversity of citizenship under 28 USC § 1332(a) because this case is between citizens of different States and the amount in controversy exceeds $75,000 per person.

9. Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims raised in this action occurred in this district, and alternatively because a substantial part of property that is the subject of this action is situated in this district.

**III.    DEFENDANT'S CONTAMINATION OF THE WATER SUPPLY**

10.  Solvay and its predecessors used PFAS, including perfluoro octanoate acid ("PFOA") as well as other long-carbon-chain PFAS, to produce polyvinylidene fluoride ("PVDF") resin at the facility for decades until 2010, at which time the use of PFAS was phased out pursuant to an agreement with the United States Environmental Protection Agency ("EPA").

11.  In addition to PFOA, among the PFAS used and discharged at the site by the Defendant was perfluorononanoic acid ("PFNA"), and as a result of Defendant's actions both PFNA and PFOA have been detected in high concentrations in Plaintiffs' private well.

12.  Gormley Plaintiffs were informed that their well is contaminated by PFAS, including PFNA at a level of up to 0.84 ug/l (840 ppt) and PFOA at a level of 0.6 ug/l (600 ppt).

13.  Plaintiff Shimkus learned that her well was contaminated with PFAS, including PFNA at .23 ug/l (230 ppt) and PFOA at .19 ug/l (190 ppt).

14.  In 2002, the Facility was the second-highest-capacity plant in the world (behind only a facility in Calvert City, Kentucky) in terms of quantities of PFNA used as a processing aid for the PVDF emulsion process.

15.  Data provided to the New Jersey Department of Environmental Protection ("DEP") about PFA use at the Facility indicate that 86.6% of the 125,069 kg of Surflon S-111 PFA mixture (which is primarily PFNA) used between 1991 and 2010 was released into the environment (*i.e.*, the surrounding air and water).

16.  Defendant improperly disposed of PFAS on the actual plant site, contaminating the groundwater immediately beneath the Facility.

17. The Facility's on-site monitoring wells show the groundwater to be contaminated by PFAS at levels as high as 73,000 ppt of PFNA and 27,000 ppt of PFOA, and up to 23,000 ppt of PFNA and 34,000 ppt of PFOA offsite. When compared to DEP's guidance level of .013 ppb for PFNA and .014 for PFOA, this data shows that Defendant heavily contaminated the aquifer with PFNA, and PFOA. These, PFAS which have, in turn, contaminated Plaintiffs' well water.

18. EPA has recognized long-chain PFAS such as PFOA and PFNA as emerging contaminants of concern. Because these are long-chain molecules, they are bioaccumulative in humans and very persistent in the environment. When PFA contamination was found widespread in West Virginia, a science panel concluded that there was a probable link between exposure to PFAS (including PFOA (C8)) and kidney cancer, testicular cancer, thyroid disease, pregnancy induced hypertension, ulcerative colitis, and high cholesterol in blood.

19. In addition, recent studies of PFAS show that PFNA has immunotoxic effects in mice (which share 99% of human DNA and which are regularly used as predictive models for adverse effects in humans) and causes other effects in animals such as liver toxicity, damage to the spleen, weight loss, lymphoid organ atrophy, decreased survival and developmental effects in offspring, and male-specific reproductive toxicity.

20. It has been estimated that up to several metric tons of PFNA were emitted yearly at the Facility for well over a decade.

21. PFAS like PFNA cannot be removed from drinking water by conventional water treatment processes; reliance on systems using, for example, granular activated carbon, reverse osmosis, or ion exchange treatment are instead necessary.

22. In or around April 2014, Solvay delivered to private-well owners in

4

the West Deptford area a flyer from the New Jersey Department of Health titled "Drinking Water Facts: Perfluorinated Chemicals (PFAS)." The flyer notes that "PFAS have been associated with a variety of adverse health effects in humans"; that "drinking water may be a major source of exposure to PFAS for people living in communities with contaminated drinking water"; that "[s]tudies of the general population, communities with drinking water exposures, and exposed workers suggest that PFAS increase the risk of a number of health effects" including "increases in cholesterol and uric acid levels"; that "PFOA and PFOS caused tumors in rodent studies"; that "[i]n a community exposed to PFOA through drinking water, individuals with higher PFOA blood concentrations had increased risk of kidney and testicular cancer"; and that "[i]n experimental animals, PFAS cause developmental effects. In humans, exposure to PFAS before birth or in early childhood may result in decreased birth weight, decreased immune responses, and hormonal effects later in life."

23. When Defendant Solvay later informed the plaintiffs of the results of their private well test it did not frankly and honestly disclose the severity of the problem. Instead, Solvay flagrantly understated the severity of the health threat, using statements such as "PFAS, including PFNA are not regulated in drinking water but their occurrence is being studied to determine if future regulation is needed" and "the DEP is not aware of any studies that have directly linked the consumption of water with PFA with any adverse human health effects."

24. Solvay's letter, attached hereto as Exhibit A, was misleading to plaintiffs and similarly situated homeowners as it never tells them they are facing a serious risk to their health. It starkly contrasts with the statements by the DEP which concluded that levels of PFNA above 13 ppt pose a risk to human health. The levels of PFNA found in plaintiffs' water, ranging up to 840 ppt, are over 60 times the level the DEP found to be sufficiently protective of human health.

25. Similarly, the DEP has concluded that levels of PFOA above 14 ppt pose a risk to human health. The levels of PFOA found in plaintiffs' water, ranging up to 600 ppt, are over 40 times the level the DEP found to be sufficiently protective of human health.

26. Solvay's letter is also misleading because it states that "our investigation will seek to identify possible sources of PFNA and other PFAS found in the sampled area." In fact, because Solvay used uniquely large volumes of PFNA relative to other facilities in the area, it is virtually certain that most, if not all, of the PFNA found in plaintiffs' well came from Solvay.

27. Since at least the 1970s, companies like Defendant who used or generated PFAS in its manufacturing processes have known that PFOA and PFNA emissions and/or releases into the air, groundwater, and surface water from its facilities could harm surrounding communities through contamination of public drinking water supplies near its facilities. Despite this knowledge, Defendant have not taken adequate steps to sample or analyze public or private water near the Facility to determine whether those supplies also are contaminated with PFOA or any other PFAS.

28. Despite knowledge since at least the late 1970s that humans exposed to perfluorochemicals, including PFOA and PFNA, would accumulate elevated levels of these chemicals in their blood, and despite knowledge since at least 2004 that exposure to even part-per-trillion levels of PFOA in community drinking water could result in significantly elevated levels of such chemicals in blood of the general population drinking water, Defendant did nothing to abate its pollution, warn the community or test the residents for exposure.

29. PFAS are produced synthetically; they do not naturally occur in the environment.

30. During the production, synthesis, recycling and disposal of PFAS, due care must be exercised at all times to avoid the release or discharge of PFAS into the environment.

31. Once released, PFAS are persistent in the environment. The destruction of certain PFAS only occurs through high temperature incineration.

32. Certain PFAS are not known to ever break down in water, soil, air or the human body.

33. PFAS (including PFOA and PFNA) attributable to releases from the Facility have contaminated the air, soil, biota, surface water (including the Delaware River), groundwater, sediments and public and/or private human drinking water supplies/sources located on or near the Facility.

34. Those PFAS are subject to atmospheric dispersion associated with the prevailing wind patterns. This dispersion results in human exposure both on-site and off-site of the Facility.

35. Because PFAS are not naturally occurring substances, all PFAS found in human blood serum and/or plasma are attributable to human activity.

36. The EPA has noted that PFOA presents developmental and reproductive risks to humans; it has also noted the results of a retrospective mortality study on certain employees at a 3M plant in Minnesota, which study associated PFOA exposure with an increased likelihood of cerebrovascular disease mortality.

37. In February 2006, EPA's Science Advisory Board's PFOA Review Panel ("SAB Panel") issued a report recommending that EPA revise its description of PFOA's human cancer relevance to reflect the fact that PFOA meets the criteria for characterization as a "likely" human carcinogen.

38. The SAB Panel has indicated that they would recommend, based on animal studies, limited human occupational epidemiological studies, and other scientific data, that EPA's PFOA risk assessment address a variety of potential adverse health effects in humans, including liver, testicular, pancreatic, and mammary or breast cancer; liver histopathology other than liver cancer; alteration of lipid metabolism; immunotoxicity and effects on hormonal systems; developmental effects; and neurotoxicity and effects on the behavioral functions.

39. DEP's March 2014 white paper notes that cross-sectional studies of the general population show associations between blood serum PFNA levels and increased cholesterol in adults, increased glucose and related parameters in adolescents, diabetes in the elderly, decreased response to rubella vaccine in children, increased thyroid horomone levels in children, and behavioral effects in children.  The existence of PFNA, PFOA, PFOS and PFHxS in blood serum were each associated with increased risk of ADHD in children and increased incidences of asthma, and PFNA specifically was associated with a significant decrease in performance of a task assessing response inhibition.

40. Exposure to PFNA causes its distribution to the blood, liver and kidneys, and it is transferred from mothers to their children through (1) the umbilical cord during pregnancy; and (2) through breastfeeding after birth.

41. PFAS, including PFNA, have also been associated with enlargement of the liver in laboratory animals, as well as other adverse effects on the liver, the kidneys, and the metabolic and immune systems of those animals.

42. For many years Defendant knew or should have known that releases of PFAS, including PFOA and PFNA, from the Facility have contaminated (and continue to contaminate) the drinking water utilized by the Plaintiffs and other nearby residents.

43. In spite of its knowledge, which was far superior to that of Plaintiffs, Defendant negligently, carelessly, wrongfully, recklessly and/or intentionally has failed to advise and/or warn citizens living and/or working in the area surrounding the Facility about the presence of PFAS in their drinking water and failed to fully and accurately disclose the true toxicity risks and bioaccumulation risks associated with those chemicals.

44. Defendant negligently, carelessly, wrongfully, recklessly and/or intentionally failed to take appropriate steps to try to reduce the levels of PFAS, including PFNA and PFOA, in the drinking water consumed by the Plaintiffs.

45. Plaintiffs have consumed and ingested water from the Water Supply and are at an increased risk for real and present physical and biologic injury (including, but not limited to, blood and/or bodily contamination via PFAS and/or sub-cellular damage).

46. There is a causal link between exposure to PFAS, including PFNA and PFOA, and subclinical or subcellular injury and/or serious latent human disease.

47. The demonstrated health effects of PFNA and other PFAS used at the Facility on laboratory animals demonstrates that the PFA contamination of the Water Supply may present an imminent and substantial endangerment to the health and safety of the public, Plaintiffs included.

48. The increased risk of serious latent diseases and other harms referred to above makes it reasonably necessary for Plaintiffs to undergo periodic diagnostic medical examinations different from what would be prescribed in the absence of such exposure.

49. Monitoring procedures exist that make possible the early detection of the latent diseases and other harms referred to in the above paragraphs.

50. Gormley Plaintiffs stopped consuming their well water in April 2014, and installed a treatment system for their well in July 2014.

51. Even though they stopped drinking their well water almost two years earlier, testing of Gormley plaintiffs' blood drawn in February 2016 shows levels of PFOA and PFNA far above the 95th percentile of what would be expected in the general population.

52. Plaintiffs were finally connected to the West Deptford public water system in August 2016.

53. As a result of the pollution of her water supply by Defendant, Plaintiff Andrea Gormley has suffered and now suffers from personal injuries including thyroid disease; she first had reason to know that her disease was caused by this pollution within the limitations period for the filing of lawsuits for personal injuries.

54. As a result of the pollution of his water supply by Defendant, Plaintiff John Gormley has suffered and now suffers from a kidney condition, elevated cholesterol and other physical ailments; he first had reason to know that her disease was caused by this pollution within the limitations period for the filing of lawsuits for personal injuries.

55. As a further result of the pollution of the family's drinking water supply, P.G., a 15 year old, now suffers from greatly elevated cholesterol, a condition which is well-linked to these chemicals.

56. The contamination of the plaintiffs' well water supply has severely disrupted the lives of Gormley Plaintiffs, their child, and Plaintiff Shimkus. They have incurred substantial costs for bottled water in order to reduce their exposure to the contaminants in the public water supply; legal fees in order to deal with the extension of a public water line onto Clement Drive; the costs of drilling a new well to irrigate their property; increased water supply costs through the public water utility; and have incurred and will incur expenses to restore their property from the harmful effects of the public water line installation.

## IV.   CLAIMS

### COUNT I - NEGLIGENCE

57.     Plaintiffs incorporate the allegations contained in all prior paragraphs of this Complaint as if fully restated herein.

58.     Defendant had, and continue to have a duty to operate and manage the Facility and its related wastes in such a way as to not create a nuisance or condition causing any injury or damage to human health or the environment.

59.     Defendant breached its duty of care by negligently operating and managing the Facility and conducting other activities there so as to cause or allow the release of PFAS into the environment, thereby contaminating plaintiffs' well.

60.     Defendant's negligent acts and omissions caused and continue to cause damage to Plaintiffs through contaminating their blood and/or body with PFAS and/or causing sub-cellular damage, in addition to endangering health and the environment.

61.     As a result of these acts and omissions, Defendant and those acting for and on its behalf contaminated the environment with PFAS, which were consumed by Plaintiffs, who were injured as a result thereof.

62.     The acts and omissions of Defendant was negligent, and as a result, Plaintiffs have suffered and/or will in the future suffer damage in the form of bodily injury, emotional distress, and/or property damage all of a type not common to the general public, for which Defendant is liable, including, liability for all medical monitoring relief required by Plaintiffs.

WHEREFORE, each Plaintiff demands judgment in his or her favor and against Defendant, and asks the Court to award each of them compensatory damages in an amount in excess of seventy-five thousand dollars ($75,000.00).

## COUNT II - GROSS NEGLIGENCE, RECKLESS, WILLFUL AND WANTON CONDUCT

63. Plaintiffs incorporate the allegations contained in all prior paragraphs of this Complaint as if fully stated herein.

64. At all times pertinent hereto, the conduct of Defendant in causing, permitting, and allowing the release of one or more PFAS into the environment, thereby contaminating the drinking water of Plaintiffs, constitutes an entire want of care and conscious indifference to the rights, welfare, safety, and health of Plaintiffs, such that Defendant's acts constitute gross negligence or reckless, willful or wanton misconduct.

65. Defendant's grossly negligent conduct proximately caused and continues to proximately cause damage to Plaintiffs in the form of bodily injury (including, but not limited to blood and/or bodily contamination via PFAS and/or sub-cellular damage) and property damage, in addition to creating conditions harmful to human health and the environment.

66. Defendant's conduct involved deliberate acts or omissions with knowledge of a high degree of probability of harm to the Plaintiffs and a reckless indifference to their welfare.

67. Defendant's conduct demonstrated a willful and wanton, malicious and reckless disregard of the rights of the Plaintiffs so as to warrant the imposition of punitive damages.

WHEREFORE, each Plaintiff demands judgment in his or her favor and against Defendant, and asks the Court to award each of them compensatory and punitive damages in an amount in excess of seventy-five thousand dollars ($75,000.00).

## COUNT III - PRIVATE NUISANCE

68. Plaintiffs incorporate the allegations contained in all prior paragraphs of this Complaint as if fully restated herein.

69. Defendant's acts and omissions with respect to the releases of one or more PFAS has unreasonably interfered with Plaintiffs' use and enjoyment of their property, invading Plaintiffs' homes and bodies, making Plaintiffs' water supply unfit for domestic purposes and consumption and placing Plaintiffs at an increased risk of developing serious latent diseases.

70. The contamination of Plaintiffs' wells has materially diminished the value of their properties.

71. Defendant's unreasonable interference with the use and enjoyment of Plaintiffs' property constitutes a continuing private nuisance. As a result of the acts and omissions of Defendant as alleged in this Complaint, Plaintiffs have been greatly annoyed and inconvenienced, have suffered and will suffer a loss of quality of life, the use and enjoyment of their properties and have been and will be otherwise damaged as alleged in this Complaint.

72. Defendant's creation of a continuing private nuisance has damaged Plaintiffs in the form of bodily injury, emotional distress, and/or property damage all of a type not common to the general public, for which Defendant is liable, including liability for all appropriate medical monitoring relief required by Plaintiffs.

WHEREFORE, each Plaintiff demands judgment in his or her favor and against Defendant, and asks the Court to award each of them compensatory damages in an amount in excess of seventy-five thousand dollars ($75,000.00).

## COUNT V - PAST AND CONTINUING TRESPASS

73. Plaintiffs incorporate the allegations contained in all prior paragraphs of this Complaint as if fully restated herein.

74. Defendant's intentional acts and/or omissions have resulted and/or continue to result in the unlawful release of one or more PFAS into Plaintiffs' bodies and properties.

75. The PFAS present on Plaintiffs' properties and in their bodies came from the Facility and were at all relevant times hereto, the property of Defendant.

76. Plaintiffs never consented to the invasion and presence of the PFAS at Plaintiffs' properties and/or in their bodies.

77. The presence of one or more PFAS in Plaintiffs' properties and/or bodies constitutes a continuing trespass.

78. Defendant's past and continuing trespass upon Plaintiffs' properties and bodies has caused damage to Plaintiffs in the form of bodily injury (including, but not limited to blood and/or bodily contamination via PFAS and/or sub-cellular damage), emotional distress and/or property damage, for which Defendant is liable, including liability for all appropriate medical monitoring of Plaintiffs.

WHEREFORE, each Plaintiff demands judgment in his or her favor and against Defendant, and asks the Court to award each of them compensatory and punitive damages in an amount in excess of seventy-five thousand dollars ($75,000.00).

## COUNT VI – Gormley Plaintiffs only --PAST AND CONTINUING BATTERY

79. Gormley Plaintiffs incorporate the allegations contained in all prior paragraphs of this Complaint as if fully restated herein.

80. Defendant's intentional acts and omissions have resulted in the unlawful invasion, contact, and/or presence of one or more PFAS with or into Plaintiffs' bodies.

81. Defendant's intentional acts and/or omissions were done with the knowledge that the contact of one or more PFAS with Plaintiffs' bodies were substantially certain to result.

14

82. The PFAS that Plaintiffs have ingested, or that are present in the bodies of Plaintiffs, originating from the Facility were at all relevant times hereto, the property of Defendant.

83. Plaintiffs never consented to the invasion, contact, or presence of one or more PFAS with Plaintiffs' bodies.

84. The continuing presence of one or more PFAS in Plaintiffs' bodies constitutes a continuing battery.

85. Defendant's past and continuing battery upon Plaintiffs' bodies caused damage to Plaintiffs in the form of bodily injury (including, but not limited to, blood and/or bodily contamination via PFAS and/or sub-cellular damage), emotional distress and other damage, for which Defendant is liable, including liability for appropriate medical monitoring of Plaintiffs.

WHEREFORE, each Plaintiff demands judgment in his or her favor and against Defendant, and asks the Court to award each of them compensatory and punitive damages in an amount in excess of seventy-five thousand dollars ($75,000.00).

## COUNT VII – Gormley Plaintiffs only--MEDICAL MONITORING

86. Gormley Plaintiffs incorporate the allegations contained in all prior paragraphs of this Complaint as if fully restated herein.

87. Each Gormley Plaintiff's water consumption has resulted in significant exposure to PFAS, relative to the general population.

88. PFAS are proven hazardous substances, and are linked to human disease.

89. Gormley Plaintiffs have been and will be significantly exposed to PFAS, including PFOA and PFNA, through the consumption of water from their well and have a

significantly increased risk of contracting one or more serious, latent diseases, a risk they would not face in the absence of such exposure.

90. The increased risk of serious latent disease described above makes it reasonably necessary for each plaintiff to undergo periodic diagnostic medical examinations different from what would be prescribed in the absence of such exposure.

91. Monitoring procedures exist that make possible the early detection of the diseases referenced in the paragraphs above.

92. Gormley Plaintiffs have no adequate remedy at law and, therefore, medical monitoring and the establishment of a medical monitoring fund are reasonably necessary to pay for medical care.

WHEREFORE, Gormley Plaintiffs demand the creation of a medical monitoring fund for each of them in an amount in excess of seventy-five thousand dollars ($75,000.00).

## COUNT VIII - STRICT LIABILITY

93. Plaintiffs incorporate the allegations contained in all prior paragraphs of this Complaint as if fully restated herein.

94. Defendant knew or should have known that its release of one or more PFAS would create a high degree of risk of toxic exposure to the persons and/or property of Plaintiffs.

95. Defendant's release of one or more PFAS is not a matter of common usage and created a significant likelihood that any harm would be substantial.

96. Defendant's release of one or more PFAS occurred on and in close proximity to established residential neighborhoods and was not appropriate for the places where they were released.

97. Defendant was aware that the release of one or more PFAS would likely contaminate drinking water sources and would thereby likely be consumed by Plaintiffs.

98. Despite this awareness, Defendant conducted its operations at the Facility in a manner likely to cause harm to the Plaintiffs and is subject to strict liability for any and all damage its operations might cause.

99. At all times relevant hereto, Plaintiffs have ingested or otherwise been exposed to one or more PFAS released from Defendant's facility which are present in their bodies.

WHEREFORE, each Plaintiff demands judgment in his or her favor and against Defendant, and asks the Court to award each of them compensatory and punitive damages in an amount in excess of seventy-five thousand dollars ($75,000.00).

## V.  JURY DEMAND

The Plaintiffs demand trial by a jury on all of the triable issues of this complaint.

## VI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs have been damaged, and are entitled to damages in an amount to be proven at trial, in an aggregate amount to exceed the following relief:

1. A judgment against Defendant that Defendant is liable to Plaintiffs for all harms resulting from Defendant's release of one or more PFAS from the Facility into the environment, including the well water of the Plaintiffs;

2. A judgment against Defendant that Defendant is liable to Plaintiffs on the claim of private nuisance for all harms resulting from Defendant's release of one or more PFAS from the Facility into the environment, including the well water of the Plaintiffs;

3.   A judgment against Defendant that Defendant is liable to Plaintiffs on the claim of past and continuing trespass for all harms resulting from Defendant's release of one or more PFAS from the Facility into the environment, including the well water of the Plaintiffs;

4.   A judgment against Defendant that Defendant is strictly liable for all harm to Plaintiffs;

5.   Compensatory and punitive damages in an amount to be determined at trial;

6.   The costs, disbursements and attorneys' fees of this action to the extent provided by law;

7.   Pre-judgment and post-judgment interest;

8.   Appropriate equitable and injunctive relief, including providing medical monitoring relief to the Plaintiffs, and to abate and/or prevent the release and/or threatened release of one or more PFAS, and to provide clean water; and

9.   For all other further and general relief, whether compensatory, equitable, or injunctive relief, as this Court may deem just and appropriate.

    Respectfully submitted,

    CUKER LAW FIRM
    **Mark R. Cuker, Esquire**

    *Attorney for Plaintiffs*

By:   */s/ Mark R. Cuker*
    Mark R. Cuker, Esquire